IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Crim. No. 06-293(NG) |
| | ) | |
| **RAQUEL CASTRO and** | ) | |
| **SAMUEL CASTRO-COLLADO,** | ) | |
| Defendants. | ) | |

**GERTNER, D.J.**

## ORDER RE: SANCTIONS
May 22, 2007

This case raises serious concerns about the way the United States Attorney's Office fulfills its discovery obligations.

The case against the defendants, Raquel Castro (hereinafter "Castro") and Samuel Castro-Collado (hereinafter "Castro-Collado") began as an investigation by the Police of Puerto Rico ("POPR"). On July 30, 2006, Jose L. Gonzalez Otero, the victim, who was seriously hurt, reported a carjacking. POPR authorities were the first responders. Plainly, their investigation of the crime scene was critical: They photographed and gathered physical evidence, including a garden tool with blood stains on it, the putative weapon. They interviewed the victim and the defendant Raquel Castro. They conducted a lineup in which the victim had apparently identified Samuel Castro-Collado. They did forensic testing of the materials they had gathered and generated myriad reports.

By August 25, 2006, the federal government took over the case, and by September 13, 2006, the defendants were indicted for carjacking, in violation of 18 U.S.C. § 2119(2), use of a

firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and possession of a firearm by an alien, in violation of 18 U.S.C. § 921(a)(3).[1]

The Assistant United States Attorney ("AUSA") represented over and over again to counsel and to the Court that he had met his discovery obligations and indeed, that the case was ready for trial. The problem was that the AUSA's representations were not true. Significant information generated by the POPR and municipal police investigation – including exculpatory information – had never been shared with the federal authorities, much less turned over to the defense. Decisions with potentially serious legal consequences were made without the prosecutor having any idea, much less any input – including allowing the car in which the carjacking took place to be returned to its owner and sold before the defense had access to it.

Defendants filed several motions for sanctions **(document ## 51, 65, 68, 76)**. Such motions are **ALLOWED IN PART AND DENIED IN PART.**

I held a hearing on March 14, 2007, to find out how it happened that the case had advanced so far - to the very eve of trial for one defendant, a possible guilty plea for the other - without having the government meeting its most fundamental discovery obligations under the Federal Rules and the Constitution.

The issue is a significant one. United States Attorneys' offices across the country are taking over state prosecutions of crimes for which there is concurrent jurisdiction. Substantial federal penalties hang in the balance. Defendants are obliged to make critical decisions about their cases, and, in the District of Puerto Rico, frequently face a firm plea or trial deadline. They have to rely on the government's timely compliance with its obligations. Fairness cannot depend

---

[1] Castro and Castro-Collado were born in the Dominican Republic.

upon the happenstance of the defense investigation, as it did in this case – that one of the redacted documents the government produced <u>happened</u> to have included a state complaint number, that the defense investigator <u>happened</u> to be able to gain access to files because state police officers <u>happened</u> to cooperate with her. If the federal government is going to federalize state crimes, and necessarily rely on state law enforcement efforts, it must have all the information from state investigatory files on which those prosecutions are based and share them with the defense where the law requires.

After a hearing, and after briefing by both sides, I find that the AUSA had plainly violated both Federal Rule 16 of Criminal Procedure and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). However, while I do not find bad faith in that violation, I do find stunning negligence on the part of the AUSA and the FBI agents assigned to this case. The question is what remedy is appropriate. The defendants have called for dismissal of the charges, in part out of their indignation over the government's failures. With one exception, they point to no actual prejudice since the trial has been continued to allow the government to meet its obligations. The only issue which raises serious concerns about prejudice involves the sale of the car in which the carjacking occurred before the defense was given access to it. However, since fundamental discovery had not been exchanged as of the time of the hearing, there was no way of discerning the significance of the car's sale – whether any and all trace evidence had been fully recovered, whether the defense can demonstrate that potentially exculpatory materials had been destroyed.

I certainly share defendants' indignation about the government's behavior. However, as I describe below, the law requires me to find the "least severe sanction" to accomplish the desired results. <u>United States v. Sarcinelli</u>, 667 F.2d 5 (5th Cir. 1982); <u>United States v. Garrett</u>,

238 F.3d 293 (5th Cir. 2000) .  As a general matter, dismissal is not appropriate where a continuance of the trial is adequate to remedy the problem.  A telephone conference will be held on May 23, 2007, to set a new trial date.  The parties will brief the issue of the car with defendants' brief due by May 31, government to respond by June 8.  Any and all pending motions will be heard during the week of June 18, 2007.

## I.     FACTS - THE GOVERNMENT'S REPRESENTATIONS

The government made the following representations both to the Court and to counsel that were not true:

To the Court: On October 18, 2006, the AUSA represented that discovery had been provided "except for certain x-rays of the victim and a statement given by Raquel Castro to state and federal officers."  No doubt based on that representation, the parties entered plea negotiations.  On November 15, 2006, the docket notes that "[d]iscovery has been provided."  The government was given "15 days to circulate plea offers" with a "[p]lea deadline of 30 days after plea offers are circulated," or January 2, 2007.  On January 3, 2007, the docket reflected that "disc. has been provided," but that counsel for Castro-Collado requested "additional discovery," as a result of which the plea deadline was extended.

To Counsel: On September 5, 2006, counsel sent a discovery request letter.  On October 11 and November 8, 2006, counsel received discovery packages containing a radiology report of the victim, a few photographs, a one page document with multiple redactions concerning the identification of Castro-Collado, several documents dealing with the investigation of the vehicle and the criminal record of Castro-Collado.  Defendant pressed with a second discovery request on February 9, 2007, again asking for exculpatory and/or impeachment evidence including (1)

"all local police reports prepared regarding the complaint filed by the alleged victim and any investigation developed by the local police . . . including but not limited to the date when the alleged victim made a complaint . . . to law enforcement officers," (2) "any physical evidence including but not limited to photographs that had been seized as part of the investigation of the case . . . ," (3) a determination of "whether fingerprints, hair, saliva, blood, or any type of forensic evidence was collected" together with any reports showing where and when they were collected and statements of the victim, witness statements. Trial was set for March 12, 2007.

The government represented to the Court at a telephone conference on March 1, 2007, that everything had been provided. It was ready for trial, it announced, even providing the Court with an exhibit list. And, in response to the defendants' motion to compel, it reiterated that it had provided (document #46): (1) all reports in the government's possession; (2) all physical and forensic evidence - "if in existence or in the government's possession"; (3) all statements of the defendant or of the victim "if in existence or in the government's possession." It added that as of March 5, 2007, perhaps a week before the scheduled trial, the "government continues to investigate this matter and is aware of its ongoing obligation to provide discoverable evidence to the defendants." On March 8, 2007, the government turned over some local police reports.

The government's representations were simply not true on a number of levels:

First, in the materials that *had* been provided to the defendants, the government had redacted information without any colorable basis for doing so. In the very important report dealing with the victim's identification of Samuel Castro-Collado, the government blacked out the names of law enforcement witnesses to the identification procedures. And again, in the document regarding the interview of Raquel Castro, in which she waived her Fifth Amendment

-5-

rights, the government redacted local and federal law enforcement officials who had been present. In each case - witnesses to an identification, witnesses to the waiver of Fifth Amendment rights – the redacted information was critical on the question of whether constitutional requirements were met.  In the records of the victim, the government excised the names of the doctors who had attended him.  In the document dealing with the vehicle, the government excised all information about the address of the driver (who was, after all, the victim) and his birth date.

Second, the government was apparently not even aware of what it had turned over.  On March 5, 2007, the government had represented that it had provided grand jury testimony of Special Agent Blanca Moore, when it had not. That testimony was not provided until two days later and, according to the defendants, provided a basis for challenging the identification of Castro as one of the assailants.[2]

But defense submissions suggested an even more profound problem than a misplaced grand jury transcript or inappropriate redactions.  Fortuitously, in the local police report that had been provided, a one page form prepared by local PR police officer Pedro Olivo-Ortiz ("Olivo"), there was a  complaint number. Through that number, Margaret Flynn, an intrepid investigator for the Public Defender, uncovered an extensive investigation conducted by the local officers, which the AUSA should have known about, but did not.  Significant materials had not been provided to the defense –  materials that had been the bedrock of the state investigation.  For example:

---

[2] The grand jury testimony, defendant reports, suggested that the victim was blindfolded, that it was dark, that he was in the back seat of a truck facing the ground.

On June 30, 2006, San Juan Municipal police officers assisted POPR officers with the victim. Later that night, the injured male, Jose L. Gonzalez Otero, was interviewed by Puerto Nuevo P.R. Police Precinct 282 officers. Precinct 282 officers then referred the case to the PR Police Headquarters Center for Criminal Investigations ("CIC"). The CIC dispatched several agents, including those from "Technical Services" to the site where Otero had summoned help. They tested the victim's vehicle (in which the carjacking had taken place), while another team of CIC agents was dispatched to the victim's apartment, again including Technical Services' support staff.

The victim was interviewed at the hospital. Sixty-nine photos were taken of the various sites where fingerprints were lifted from the apartment and the car. Physical evidence was seized, including a gardening tool with blood stains. Interviews were conducted which ostensibly produced inconsistent statements of the victim. Numerous reports were prepared – by local municipal officers, local officers from Precinct 282 and from the CIC, including fingerprint and serology analyses. After a month of local investigation, the case was turned over to the FBI Special Agent Blanca Moore ("Moore"). But while the FBI took over the case, it received next to nothing from the existing local files.

The state officer, Agent Olivo, testified that the federal authorities simply did not ask for anything but his own personal records, which he turned over. He did not turn over physical evidence, over sixty photographs, fingerprint or blood reports, etc., just because they were not in his physical custody. The issue, according to Olivo, was simple: Of course, he would have given the federal agency everything they asked for; they simply did not ask for much. And even though Olivo knew that physical evidence had been seized from the victim's apartment, from the car,

-7-

that photographs had been taken, he did not think it was his obligation to alert the FBI to the additional evidence, much less take it upon himself to gather it. This was so even though Olivo agreed that it was certainly unusual for the FBI to ask for his file and only his file.

Special Agent Eric Gonima ("Gonima") testified that he had asked Olivo if he had anything concerning the case at bar. When Olivo said that he did, and turned over a slim file, "that was it" for Gonima. He just left his card. He was not the agent assigned to the case so he did nothing more. Special Agent Moore, who was the agent assigned to the case, testified that she "kept on calling" Olivo but was provided nothing further. She did not assume that there was any physical evidence because she was "under the impression" based on the victim's statement that the car had been given back to him. That stunning fact – that the car had been returned and sold without defense access to it – apparently did not phase Moore. The defense found out about the car's absence during the March hearing. Apparently, the trial and even a plea could well have proceeded without anyone bothering to let the defense lawyers know.

Notwithstanding Moore's failures, she had no problem swearing to statements in an affidavit on which the initial federal complaint was based that she was familiar with the offense "[a]s a result of my personal participation in this investigation, conversations and reports made to me by other Special Agents of the FBI, officers of the Police of Puerto Rico (POPR), witnesses and other concerned parties." She obviously was not familiar with the POPR investigation.

Nor was there a reasonable explanation as to why the United States Attorney's office redacted even the limited material that had been turned over to the defense from Olivo. On the form involving crucial lineup procedures and the form describing the interview of Raquel Castro,

the AUSA reported that "it's just habit" to delete names on these reports. He acknowledged that he did not know that he had deleted the names of law enforcement officers. Even though he had been assigned to this district for over a year, he did not know what the initials beside the names stood for, that "CIC" was the PR Police Headquarters Center for Criminal Investigations.[3]

If the FBI believed that the state authorities had *done nothing* to investigate the case in the month that they had it, the Federal authorities plainly had an obligation to do its own investigation – at a minimum, to see if there was physical evidence, to assemble whatever material there was for testing, to talk to the officers who had been at the scene on the evening of the offense. All the FBI apparently did was talk to the victim and recounted the victim's account to the grand jury through agent Moore's testimony. Since the victim said there was a gun, they proceeded on that theory, even though no gun was found by the state authorities, and the only weapon-like instrument found was a gardening tool with blood stains. Nor did they interview any of the first responders to make certain that there were no versions of the offense inconsistent with the version Moore gave to the grand jury. And then, as the agents reported, they stood idly by when it appeared that the car – in effect, a crime scene – had been returned to the victim and sold.

If the agency believed that there *was* more information in the state files, they should have sought it out.   Even a cursory review of what Olivo  provided ought to have put the FBI on notice that fundamental evidence was missing. The FBI and state authorities had worked

---

[3] He also indicated that some of the redactions on the victim's records were because of the Privacy Act, 5 U.S.C. § 552a. While the Act may address the victim's social security number, it hardly justifies withholding the identities of the doctors who treated the victim, the victim's own date of birth, etc. Nothing about § 552a trumps the government's obligations under Rule 16 of the Federal Rules.

together on many carjacking cases. Indeed, the FBI office in San Juan included at least one former state law enforcement agent.

Constitutional rights and obligations apparently depended upon something akin to the child's game of "twenty questions." According to Olivo, who the federal authorities counted on to act as a liaison in this and a number of carjacking cases, the FBI had just not asked the question in the right way. According to Moore and Gonima, they had asked the right questions, but Olivo was remiss in not fully responding. Sadly, it did not occur to anyone that there was something seriously wrong.

The extent of the error was discovered by the public defender's investigator Margaret Flynn on the eve of trial. Using the complaint number, she went from one municipal police officer to another. She discovered an extraordinary amount of material – plainly discoverable under Rule 16, Brady and Giglio v. United States, 405 U.S. 150 (1972) – inconsistent statements of the victim, or the codefendant; evidence inconsistent with a finding that a gun was used, forensic tests, physical evidence, etc. Apparently, all it took to find the material was an understanding of how records are kept by the local police, where the local police offices are located and a willingness to walk from one floor to the next. That neither the FBI nor the United States Attorney's office managed to do this is troubling, to say the least.

## II.   REMEDY

### A.   Brady and Rule 16 Obligations

Brady v. Maryland requires the government to produce to the defendant, in advance of trial, material exculpatory evidence that is within its possession. See 373 U.S. at 87; United States v. Agurs, 427 U.S. 97, 107 (1976); United States v. Huddleston, 194 F.3d 214, 222 (1st

Cir. 1999). Evidence "within its possession" includes exculpatory information in the possession of any agency that participated in the investigation of the crime charged. See Kyles v. Whitley, 514 U.S. 419, 438 (1995) (explaining that the Brady rule includes evidence "known only to the police investigators and not to the prosecutors"); In re Sealed Case No. 99-3096 (Brady Obligations), 185 F.3d 887, 892 (D.C. Cir. 1999); Brison v. Tester, 1995 WL 517603, *2 (E.D. Pa. Aug. 28, 1995). And the duty to produce, obviously includes the duty to find out about "any favorable evidence known to others acting on the government's behalf in the case, including the police." Kyles, 514 U.S. at 437. See also Ruiz v. United States, 221 F. Supp. 2d 66, 74 (D. Mass. 2002).

It surely is no defense to a Brady challenge to say that exculpatory evidence was in the hands of the state authorities, where the federal authorities are relying on that investigation. As the Supreme Court noted:

> But neither is there any serious doubt that "procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it." Giglio v. United States, 405 U.S. 150, 154 (1972). Since, then, the prosecutor has the means to discharge the government's Brady responsibility if he will, any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials.

Kyles v. Whitley, 514 at 438.[4]

---

[4] Kyles was a state prosecution in which state prosecutors claimed not to have – and therefore not to produce – other information in the hands of state law enforcement officers. But while Kyle involved state law enforcement and state prosecutors, there is no question that it has been applied to federal prosecutions based on state law enforcement efforts. State reports plainly qualify as potentially exculpatory materials and documents "material to preparing the defense." Rule 16(a)(1)(E). And, if they had not been turned over, and surfaced after a trial, they could

Rule 16 requires that, upon the defendant's request, "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these, if the item is within the government's possession, custody, or control" and the item is "material to preparing the defense." Surely photographs of the crime scene, interviews with the victim, physical evidence including blood, fingerprints, potential weapons, documents relating to the identification procedures used to identify the defendant Castro-Collado, or to obtain a waiver of defendant Castro's Fifth Amendment rights, are "material" to the defense, even if they are not exculpatory.[5]

B.      **Information Not Disclosed**

Fed. R. Crim P. 16 (d)(2) provides that if a party fails to comply with its discovery obligations the court may   a) order that party to permit the discovery or inspection, b) grant a continuance, c) prohibit that party from introducing the undisclosed evidence, or d) "enter any other order that is just under the circumstances."  The case law suggests that in making that decision,  I am to impose the "least severe sanction that will accomplish the desired results,"

---

well have been the basis for a motion for a new trial. See Ruiz v. United States, 221 F. Supp. 2d 66 (2002 D. Mass. ) (discussing the relevancy of a Boston Police Department report in a motion for a new trial of a federal arson case).

[5] The kinds of problems reflected in this case led to the promulgation of a Local Rule in the United States District Court for the District of Massachusetts. The Report of the Judicial Members of the Committee Established to Review and Recommend Revisions of the Local Rules of the United States District Court for the District of Massachusetts Concerning Criminal Cases (October 28, 1998) at 8, noted that "cases too often get to trial without legally required discovery being provided.  Such problems present judges with challenging issues to be resolved promptly, and threaten both the fairness of the trial and the finality of any conviction," cited in United States v. Diabate, 90 F. Supp. 2d 140, 141 (D.Mass. 2000).  That report led to the promulgation of Local Rule 116.8 which requires members of the United States Attorney's Office "to inform all federal, state, and local law enforcement agencies formally participating in the criminal investigation resulting in the case of the discovery obligations that are set forth in the Local Rules."

considering a) the reasons the government delayed producing the requested materials, including whether the government acted in bad faith, 2) the extent of the prejudice to the defendant as a result of government's delay, and 3) feasibility of curing prejudice with a continuance.

As I have described, I find stunning negligence on the part of the government, but not bad faith in their failure to meet their obligations. The AUSA did not know the acronyms for the POPR and municipal agencies with which he was dealing. When he saw the initials, "CIC,"he did not know what that meant, and redacted the names of the CIC police officers. And he was "in the habit" of deleting names of individuals apparently without checking. The FBI agent kept on calling Olivo, but did not ask the right questions, or even critically evaluate what had been turned over.

Since the defendants' trial has been delayed, I cannot find prejudice, a factor as to which the defendant has the burden. United States. v. Spinosa, 982 F.2d 620, 631 (1st Cir. 1992), United States v. Formanczyk, 949 F.2d 526, 530 (1st Cir. 1991), United States v. Hemmer, 729 F.2d 10, 13 (1st Cir. 1984 ), cert denied, 467 U.S. 1218 (1984). In effect, counsel is harmed by her own diligence. The defense was able to find out about the government's defalcations, to do what the government was unable to do. Ironically, the more diligent the defender is, the more we excuse the government's negligence.

Dismissal is an extraordinary remedy. United States v. Richman, 600 F.2d 286, 292 (1st Cir. 1979), United States v. Gladney, 563, F.2d 491 (1st Cir. 1977). Had this information been found out after trial, or mid-trial, after jeopardy had attached, it might well have vitiated the conviction. United States v. Hibler, 463 F. 2d 455 (9th Cir. 1972). But it was not; it was discovered in time to give both sides the time to redress the problem. Cf. United States v.

Diabate, 90 F. Supp. 2d 140 (D.Mass. 2000)(dismissing the case rather than granting a continuance because a jury had been selected.)

Defendant suggests that the government's failures have undermined their speedy trial rights – that this information was disclosed just as the speedy trial clock was about to run out. That is a concern, but the Speedy Trial Act itself does not create an absolute entitlement to a trial at a given date. There are reasons for delay which the Act acknowledges, including the pendency of challenges to discovery like this one.

### C. The Car

During the March hearing, the defense learned that the government permitted the victim to sell his car. As such, it is not available for further testing by the defense. At this juncture, there is no indication what further testing would have accomplished since there was no record as to what the existing tests have disclosed. (As of the time of the hearing, the government had no idea what tests the state authorities had performed on the victim's car before it had been sold.)

The case law concerning the failure to preserve "potentially useful" evidence is framed by Arizona v. Youngblood, 488 U.S. 51 (1988). Youngblood requires that the Due Process clause does not require the state to preserve evidence that may be useful to the defendant unless the defendant can show bad faith on the part of the police. See e.g., United States v. Valenzuela-Bernal, 458 U.S. 858, 873-74 (1982) (which held that sanctions against the Government for deportation of a potential defense witness were appropriate only if there was a "reasonable likelihood" that the lost testimony "could have affected the judgment of the trier of fact").

To be sure, if the defendant can show that this evidence is more than just "useful," that it would have been exculpatory, the outcome might well be different. The government violates the

due process clause when it destroys evidence that possesses an exculpatory value "that was apparent before the evidence was destroyed," and when the defendant demonstrates that he would be unable to obtain comparable evidence by other reasonably available means. California v. Trombetta, 467 U.S. 479, 489 (1984). Since the record on this issue was not developed at the March hearing, I will give the parties an opportunity to brief the issue further, and hold further hearings during the week of June 18, 2007.

### III.   CONCLUSION

It is hereby **ORDERED** that the government is to meet all of its discovery obligations by no later than **May 29, 2007**. A telephone conference will be held on May 23, 2007, at 2:30 p.m. to set a trial date. Briefing on the car issue will take place as follows: **Defendant's brief by May 31; government's response by June 1. Hearing held during the week of June 18, 2007.**

**SO ORDERED.**

**Date: May 22, 2007**          /s/Nancy Gertner
                                **NANCY GERTNER, U.S.D.C.**